Case number 145418 Virginia Caudill v. Janet Conover. Oral argument not to exceed 30 minutes per side. Mr. Burke for the appellant. If I could have five minutes for the rebuttal. May it please the Court, Dennis Burke on I'm going to address both claims that were raised in the brief. The first being the Batson claim and the second being the ineffective assistance of counsel in mitigation. First, regarding the Batson claim, this is a third step of Batson claim. That is, after the prima is established and after the race neutral reasons were proffered by the Commonwealth, then the trial court is obligated to conduct a sensitive inquiry into all circumstances related to the strikes by, in this case, the prosecutor. In Virginia's trial, the voir dire took place over three days and then the preemptory challenges were made on the fourth day. At that time, defense counsel challenged the striking of eight of nine preemptories of white males. So there were nine preemptories, eight of nine were white males. At that time, the judge said he expressed skepticism that there was an equal protection for white males. But then he said, to go ahead and provide the race neutral reasons. And so, that's what the... Can I just stop you on that one? Is it clearly established law at the time of the trial that Batson extended to exclusion of whites, number one, and men, number two? I mean, you know, the key cases didn't involve that. Yes, Your Honor. It was clearly established for a couple of reasons. One, Batson v. Kentucky, which of course was in the context of discrimination against African Americans, but nevertheless, the plain reading of the opinion allows equal protection for, it does not guarantee defendants to have jurors of their own race, but it does guarantee that they will, that jurors of their own race will not be discriminated against in the selection of that jury. That's number one. The U.S. Supreme Court said that? That's Batson's... No, I know, but I'm asking, has the U.S. Supreme Court had a case like this one, where it's the exclusion of white men and jurors? No, Your Honor, but it's still clearly established law for, one, because nowhere in Batson does it say it's limited to minorities, number one. But the explanation is, you know, it's really hard to see that case coming out the way it did without the history of systematic exclusion of African American jurors, particularly with African American defendants. But here's the thing. So, I mean, there are a couple things to think about. One, like I said, is the plain reading of the opinion. And that's just that part. Nowhere, of course, does it say that it's limited to non-whites. Number two, when it establishes the three steps, it requires, in the first step, that there be a identifiable racial group. And, of course, Caucasians or white people are an identifiable racial group. And, again, the language in no way says, but only racial, minority racial groups. It says racial group. And the third reason for that is, one of the reasons for Batson, and the court has talked about this, is the importance of protecting the equal rights or the rights of jurors, the defendant, and also to the extent that the community has confidence in the jury system. And if we had a circumstance where white people could be discriminated against based on the race of the jurors, and no one else, then I am afraid that the confidence in the jury system would be, or in the justice system, would be non-existent. I quite agree. That might be a good reason to extend it there. I just, well, I think, I think, I think, Your Honor, that if you think of race discrimination in schools, you know, admission to higher education took a long time after the cases prohibiting states from denying an African-American, let's say, to the University of Texas. Okay, but. For the same principle to apply to a white in Bakke. I understand. That's the analogy I'm drawing. I'm just wondering about it. I understand, but what's important, this isn't, this is not an affirmative action process or exercise. This was a trial of someone who is on, who is on trial for her life, or both defendants were, so and there's nothing in Batson, or for that matter, well, you know, we'll stick with Batson because we know that that was clearly, that that was, had been published at that time, that says anything about providing some sort of racial benefit to minorities to make up for, or to, you know, to prevent the disparate treatment that they have received in the past. It is rather that everyone is entitled to a jury that is free from racial discrimination, or the selection based on racial discrimination. So, Are there other cases than Batson that might stand for that principle, like Powers v. Ohio? Yes, of course, Powers v. Ohio involved a white defendant, and in that case, the court talked about the, and that was also decided at the time of the trial, and that actually discussed, and that went into what even more depth or discussion of the community, and the importance of the justice system, that of the community having, Powers is a white defendant, and also were they white jurors that were, it was a white juror and a black defendants, I'm sorry, black, white defendants and black jurors. But the other thing that's important here, too, is that, of course, is that claim has never been raised below, or a suggestion that's not clearly established has not been, has not been raised below, and certainly the Kentucky Supreme Court presumed that it was, that, that Ms. Cottle was protected, and then so applied Batson accordingly. You've been talking about this in terms of race. Was there also a gender claim that was made, and are you still arguing? Yes, yes, I've been talking mostly in race, but yes, there, they were all white, eight of nine were white males, right, and she, of course, is a white female. And did you raise that throughout, as a gender claim, as well as as a race claim? Yes, Your Honor. It was, it was raised at the trial court, and of course the Kentucky Supreme Court decided, both the trial court and the Kentucky Supreme Court decided it that way. So there's no question of whether, you know, that it was in some way defaulted, and it's been raised, it was raised both in the district court and here. So getting back to the voir dire process, after the, the eight strikes were offered, the trial judge, in three seconds time, declared that the that the proffered reasons were race-neutral, which I think goes much more to that, it was much more likely that he was actually confirming the, that the eight offers were facially race-neutral. And then he, and he said, for whatever magical reason, if the Court of Appeals wants to consider this a white man of protected class, I'll accept them, those objections, for the record. So two things. One, it appears that he wasn't, there's a good chance he wasn't deciding it at all based on whether or not the credibility of the, of the prosecutor, or that he was credible. Well, he did say the reasons were race-neutral, right? Yes, but... Can we, at this stage of this case, disbelieve that statement by the district, or the trial judge? Yes, Your Honor. We can? Yes, and, and here's why. As we know, step two, that is required, that, and, and that is a, is a quote from Bassan, that the, that the, the prosecutor has to offer race-neutral reasons. I thought he did that. Right, and so that's my point, is that the judge was confirming that those reasons that were asked were facially, at least facially, race-neutral for purposes of appeal to go up to the contextual court. Well, I mean, you're adding modifiers, you know, at least facially. I mean, I thought it just said he accepted. He did. He did. But... He believed those reasons. Sure, but we know that he couldn't have done his obligation under the, under step three of Bassan. That's kind of where I'm falling off the wagon. Okay. Okay. Because, let's just go to the point of clearly established law. I mean, what, what Supreme Court case says that a trial judge has to have some longer and more express or explicit discussion before reaching a conclusion, as opposed to, potentially in this case, listening to the reasons as they're offered and, frankly, you know, making judgments about them as they're offered. And by the time it's done, the judge has, in fact, made a determination in his mind, and he announces it. Okay, so a couple of, a couple of points on that. One, there's nothing that, and this isn't claim, that he has to spend a particular amount of time. But what the evidence is, is that he spent three minutes deciding. I'm sorry, three seconds deciding. But, I mean, where's the three-second rule in the Supreme Court's case? Well, but keep in mind that he has to make a sensitive inquiry of all the circumstances. And so I would say to you this, it is physically impossible for the judge to have done that for one person, much less eight. Let's say I wholeheartedly agree with you, hypothetically. Okay. Where is it that the Supreme Court has agreed with you? That, that it has said a sentence, that as a matter of law, no trial judge can make this sensitive inquiry in that amount of time. What's your best case? The Supreme Court doesn't have to say that, Your Honor. What the Supreme Court said, my best case is Batson. In Batson, they said a sensitive inquiry into all the circumstances. Okay, but. And what's clear, well, I mean, at some point, yes, we do have to use common sense and decide, is it humanly possible for a judge to have considered eight individual strikes and considered all the circumstances and all of those jurors, keeping in mind that went over three days, plus an additional day, plus. The judge was there the whole time. It's not like he just walked into the courtroom and this is all news to him. Sure, but here's a really strong indicator that he couldn't possibly have done that. And which, first of all, I, and I would suggest to you that he, it is humanly impossible to begin with, because that would also require him to have considered the jury strike sheets and the questionnaires. It would have required him to have memorized all of the testimony by those jurors over four days. And not just those eight strikes, and not just the 36 people that made it through the, the, up to the peremptory stage, but also all of those jurors that were struck for cause, which is another, I believe, 20-some-odd jurors. So, but here's why we know that that didn't happen. And that is, one day before that, which was to say, this was on February 9th, the day before, defense counsel for the co-defendant approached and asked the court to, that he had forgotten to strike, he wanted to, he wanted to ask the judge to make a ruling for cause on a juror, who had, he had, he had failed to ask for, for it to be struck at the, the jury to be struck at that time. And what the judge said, and this was for one juror, one day later, as opposed to four, one juror as opposed to eight, and he said, and he could not remember, and at that time said, and I have no way of going back. When, of course, he did, he could have gone back and looked at the videotape. But what we know from that is two things. One, that he did not remember for a single juror for a single, a single day later. And two, that he was not inclined to go back and look at the videotape to actually establish what the juror said. So to suggest that then, now, he was able to cite eight jurors over four days of, of testimony, or three days plus another day, is impossible, frankly. I understand your argument. That, that was helpful. Thank you. Okay. So, given that, what we know from Supreme Court precedent is that the trial judge is responsible for the step three of Batson. Which didn't happen here, and it all, and it's not something that can be done by the appellate court. So the appellate court, there, the only role for the appellate court is to consider whether or not those reasons that were provided are, were true, or were not clearly erroneous, the findings by the trial judge. So under these circumstances, where there was no step three analysis, what has to happen is that this, the petition has to be, the habeas petition has to be granted. With one of three options, and I suggest that the, the appropriate one here is that the, the court order a condition upon a new trial. Because, you know, I'm gonna, before we get there, I'm gonna push, just pursue the line of questioning Judge Ketler started you on. I mean, I, I feel like three seconds is a little bit of an exaggeration, because I don't understand why a judge isn't thinking about each of these points as they're listening to the prosecutor. So that, that seems to me fair game. Well, it's not as if Batson comes out of nowhere. It may come out of nowhere that it's being applied here, but they're certainly aware of, they've watched this whole thing unfold. So you have to give them a little bit of a benefit of the doubt. But I guess my real point is this. Surely, there are Batson cases where it's incredibly obvious that it is a fanciful Batson claim. It doesn't take three seconds. It doesn't take 0.5 seconds. It takes whatever it takes to say no. So you just can't have a rule, which you're, you're trying to say, forget whether there's authority out there, you're trying to say there's a rule that says there's a certain amount of time it takes for a step three thing, and that can't be right, because there can be frivolous. I think they can just mistake the race, for example. You need more time to assess that. But if that's, if that happens, again, so, so the, the prosecutor says, this is going to force us into a facts and circumstances test, which it has to be. But he, but the judge cannot abandon the step three requirement. He can't say, oh, I'm not going to do it. That's not the premise of my question. The premise of my question is that some cases are going to lend themselves to three or 0.5 seconds, because they're incredibly frivolous Batson claims. I'm not asking for... Others will require two more days of testimony and maybe an expert. So, I don't understand what we do with that range of possibilities, which I think you're agreeing exists, because we need to say there's a clearly established rule that doesn't allow what happened here. Sure, and I, and I hate to go back to Batson, but I suggest to you that the rule is that the trial judge must make a sensitive inquiry into all the circumstances. That's the rule. And in this case, I can't tell you on other cases. I can tell you on this case, that didn't happen. It didn't happen for one, and it didn't happen for eight. And as we know under Batson, there, it only requires one juror who is, who is struck based on race, or under racial, or in this case, or gender discrimination, before the conviction must be vacated. And so, the, in this case, because that Batson didn't, that step three analysis didn't happen, has to be remanded. It has, and in this circumstance, the, the petition should be granted, and a new trial should be granted, because... Could you be specific about the jurors as to which are the ones that it really wasn't plausible to, I mean, I thought the best argument you had was this idea that some of the things had to be consistent, or maybe were inconsistent with the questionnaire. It was very hard to assess what was being said by the prosecutor versus the questionnaire. What, give me the, the best examples of jurors where it's a, it's a, it's a tricky question, and it's just not possible to do that in the time this judge did it. Well, I think the, there are, there are, there are a couple. First of all, and this goes, and I, and I, it's important to note, this goes to what the judge's requirement is, which is to say he needs to, to examine the record, all of the, all of the circumstances, that one of the jurors was, the reason he was struck is because he had a grade school education. Now, that discussion never came up in the voir dire, which means that the only way that that could be confirmed, or refuted, is by reviewing those, those records, the, the juror questionnaires, and that would not be just aid, of course, it would be, the judge would have had to have known all of those things long... Later examination proved that was wrong? No, it was actually, it was right, but there were circumstances where later examination of what the jurors said, what the prosecutor said was wrong. But it's, it's reversible when you do an insensitive analysis. No, I'm not, no, that's not right. I think it's important to stress, that's not my claim. My claim is he did not do the analysis, and we know he couldn't have done that analysis in the time allotted, given all the things that he could have considered, and... So anyway, one of them is education. It's, it's really a fair point. How could you go back and check that? It's doubtful it was memorized, but you're acknowledging, it turns out the judge was right about that, or the prosecutor was right about that, and that's not, that's, that's a race-neutral, but go to another juror, go to another juror. Okay, so there was a juror, and I can't tell you that, it's in the brief, I can't tell you at the, at the top of my head, his number, but a juror who, the prosecutor struck him because he said that he was blood brothers with the defense, defense counsel, one of the defense counsel, and that he had, had a conversation about the death penalty with the attorney's brother, who he went to law school with, and that was false. He, in fact, said, didn't know, other than he knew that his brother was a law student, the defense attorney didn't know the, the juror, and there was no discussion. He actually said that they didn't really talk about the death penalty. This is one where it was inaccurate? That's correct. What the prosecutor said was inaccurate? Correct. And that's been proved since? Correct, and how does that show race-based or sex-based? It shows that the judge didn't do his job, his duty, his responsibility of the step three Batson analysis, along with, of course, all the other reasons that I, that I mentioned. In my limited time here, if I can, I'd like to address the, the second claim, and that is the ineffective assistance of trial counsel at, in penalty. First, I'd like to, the Kentucky Supreme Court's, the standard that they used was the wrong one. They applied, or they decided that the investigation was reasonable based not on any sort of examination of the investigation that was done, or whether or not the investigation was, rose to the level of reasonable professional norms, but rather based on what was presented at trial, which is not the standard. And so, for that reason, the, misapplication of a standard? I think it's, I think it's the wrong standard. So it'd be, it would be contrary to, your honor. All right, and well, that's another issue. So what is the, the accurate standard? So the actual standard in this, in, in Wiggins v. Smith, the Supreme Court talked about the prevailing professional norms, and looked to the, to the ABA as guides, and accepted or adopted the ABA standards from 1989 regarding investigation. That was that the attorney make efforts to find all reasonably available mitigating evidence. So all reasonably available mitigating evidence, and we know that the Defense Counsel didn't do that in this case, because there were a great number of or several witnesses who testified regarding of another important aspect, or a very important aspect of the, of the, of the mitigation strategy, is that Virginia had been abused as an adult by a great many boyfriends, etc. And none of those interviews were done. There were, of all of that evidence that was presented, none of it was, none of, none of those people were interviewed. But not only that, there were medical records establishing or confirming that, that, that she was abused. And those records weren't provided to the, either the, weren't, weren't entered into evidence, weren't provided to either one of the experts. And in fact, those records were not requested until January 24th of 2000, and the trial began on February 4th. So, I think it's fair to say that that investigation fell below reasonable professional norms. But that's not all of that, of that, of that performance that was lacking. One of the, perhaps the most important evidence that the jury didn't hear, was that Virginia suffers from a brain injury, which the neuropsych, neuropsychologist, I'm sorry, Dr. Allen. Isn't he really a mixed bag for you? I mean, Dr. Allen also says that she told him that she was not, that her father was not abusive to the children, and that, you know, they're sort of just making that up. Well, she didn't say, no, I mean, I think, isn't that an entirely, you know, isn't that counsel's call? Well, you know what, it would be counsel's call if he had performed a reasonable trial strategy, if his preparation had been reasonable. But it wasn't, and not just because of a failure to get the records. But as it turns out, Dr. Allen, he told the trial judge at the time, at the beginning of the penalty phase, that he was not going to call Dr. Allen because he didn't have his, his report from, he had not yet received his report from Dr. Allen. And he told the judge the reason he hadn't received the, the report, is because he hadn't gotten the report from Dr. Schilling, who is the other, the first expert. And Dr. Schilling is the one who said there, more investigation needs to be done, and recommended that there be a neuropsych evaluation. But Dr. Schilling. I see how the omission of Dr. Allen's testimony is, is prejudicial within the meaning. But let me, so, but if I could go, to point out that, so the reason why that report from Dr. Schilling wasn't available is because trial counsel had not requested it until October or mid-October, or even November of 2000. And the reason, but here's the thing, the reason he hadn't is because he took a leave of absence. And when he took the, and he took the leave of absence, he expected someone else to, to make the, to do those efforts. And he didn't, because he, that, whatever that attorney was supposed to do, took another job. So we're not talking about investigation that was in any way reasonable. And that's why it was, it was, it was careless. It was inattentive. And that's why we can't rely on the, the speculation. Okay, I see him out of hand. Thank you. Thank you. May it please the court, Mr. Burt. I just want to spend one minute talking about the victim in this case. My mentor, when I started this job, always talked about how capital cases, especially oral arguments, it seemed like the victim was the one person that never really got talked about very much. And I just wanted to note that Lynetta White was a 73 year old woman. By all accounts, she was a vivacious, very active person, very loved. She had 14 siblings and she was brutally and viciously murdered by Ms. Cottle and Mr. Goforth. And she certainly didn't deserve that, but never. So on this, on the Batson thing, what's your response to the two jurors that he points out? You know, so clearly Batson does talk about a rule of, you know, the step three, something has to happen at step three. At a minimum, there's a finding and how much deliberation, not clear. But he, he's concrete about two of them, right? One of them about lack of education, which would be hard to confirm the prosecutor was right without checking. It turns out, I guess he was right in that instance, or she, I don't remember the gender of the prosecutor. But then the second one, I guess, was wrong about who this juror knew. What's your response to those two pretty concrete objections? My response at the opening would be that, as was pointed out, there's no clearly established. Okay, let's just, let's say, let's say for the sake of argument, Batson establishes this step three rule and it requires, once you bypass that first part, my response would be that, unfortunately, and I know Mr. Burke's in the same spot I am because we've both worked against each other now probably 14 years, you take these cases over years after someone else has started it and you, as you kind of run through this stuff, you find things that you didn't realize were there or that someone got wrong. And in particular, the first juror he's talking about, 776, is Nicholas Edwards. Mr. Edwards had a great school education. That's correct. But that was the third thing that Mr. Larson, the Commonwealth's attorney in Fayette County, noted to the judge when he brought up why he struck Mr. Edwards. First, he said that one minute he said he didn't believe in the death penalty and then the next minute he said he did. If you go back and look at Mr. Edwards' testimony, which is transcribed as well as in the video record, that's exactly what happens. The judge asked him to give a statement. Can you accept the maximum or the minimum penalty? And he says, yeah, I can consider those. Then the prosecutor asked him the same question without noting. He just says maximum or minimum. And the guy says, yeah, I can do it. So then they say, well, what do you think about the death penalty? And he goes, oh, I'm against it. So then the prosecutor jumps back up and says, well, wait a minute. You just said you could consider it. You can consider the maximum. Oh, when you said maximum, I thought you meant life without parole. So that was the beginning point for why Mr. Edwards was on their list. He literally, and he did it again later, at another point he mentioned he could maybe consider it, and I think he said a drastic circumstance, but then... I get it. How about the other one? Okay, the other one was 723, that's Mr. Keston, and the thing with Mr. Keston, the first portion of the objection is that the Defense Counsel attempts to create a familiarity with him, the fact that he knows his brother went to law school with him. That sort of bleeds into asking him some of these other questions, you know, well, we had this law school class together, we went down to the... These are questions by Defense Counsel. Yes, Defense Counsel talking to that juror, and then that juror mentions that, yes, you know, I am this guy's brother that you're talking about. Yes, he did mention that class to me. We didn't talk about it much, but I'm aware of it. Is that the class that you guys went down to London and went to a jail? And the Defense Counsel says, yes, it is. Now, he at one point, or at the beginning, says he's practically blood brothers, referring to the juror, practically blood brothers with the defense attorney. All I can say about that is if you had any experience with Ray Larson as a prosecutor, it was an exaggeration. Typical of his personality, it wasn't meant that he actually was a blood brother or that he was saying that they had some sort of secret relationship or anything like that. It was more just trying to get a point across about the familiarity issue that he didn't like. But isn't the really troubling thing here that the trial judge goes like that and says I reject all of the challenges without doing the kind of analysis that you're doing? I don't think so, because in my opinion, as was pointed out earlier by Judge Sutton, you've got... But if the judge somehow has amnesia by day four about every juror, we're talking about 36 people approximately that, I think that's exactly right, that were qualified for the jury pool. But if they whittle it down to these 15 people, and so the ones that are struck, if he doesn't have any memory of every one of them, then why do we even trust a jury to have a memory of a week's worth of testimony? You know, how can we trust anybody to remember anything? I think he listens to those arguments. Certainly, if he doesn't recall it immediately, he can recall it as he's listening to the argument and thinking about it. So I think, one, you can't assume that he just doesn't remember anybody right at the beginning. Two, as the prosecutor is talking about these people and raising these objections, he can recall the same circumstances that the prosecutor is noting. And I think a critical point, too, which this idea that the judge was essentially going through the motions because he didn't really believe that this was a true Batson issue, I think he's right. I mean, if you go back and look at the case law, as you mentioned, there's no clearly established case that says that this would be a Batson issue. We've got a white defendant, we've got a white juror, Batson involved minorities, black defendant, black juror, Powers v. Ohio was a prosecutor excluding black jurors with a white defendant, and then McClellan v. Georgia was a white defendant striking black jurors. And there's precedent in this circuit that says that Batson and its progeny does not cover this particular circumstance. The... And I apologize, I did not take French in high school or college, so it's Eklund v. Locuro, 995, Fed 2nd, 1344, 1993. They say point-blank, it's a pre-AEDPA case, but they say we hold that Batson did not decide a question of a white defendant standing to raise equal protection claims excluding white veneer persons. So this... The judge in this case, his analysis, if anything else, or his reservations about whether or not Batson would even apply, he actually was right, but they still went through the process anyway. So you're jumping through all these hoops. Does he have to make express findings? No, the Supreme Court doesn't say he has to make express findings. Is this even a Batson issue at all? I don't know if that's the cart before the horse or the horse before the cart, but both those things are extremely important. Before you even get to the fact that, in my opinion, the reservations that Mr. Burke has about the reasons given by Ray Larson during the Batson hearing, essentially, he was actually correct or you know, the one thing he wasn't correct about was the practically blood brothers, and I don't really know that that's something you can decide was correct or not correct, but they, you know, it was definitely an overstatement of the relationship, but again, that was part of an issue. Because in addition to that, he mentions that, and this may have a lot to do with why you sort of have to rely on the trial judge here, but he mentions that, you know, well, they were down in London with Roberta Harding, you know, bashing the death penalty. Well, I went to University of Kentucky Law School, so and these people were in Lexington where that school exists. Roberta Harding is an outspoken death penalty opponent who is on the faculty at UK. She's a great teacher, but I've dealt with her my whole career since I've left there because she's typically, you know, she gives lectures and seminars and that sort of thing, so they know who that is, and it didn't come up during... It was in London, you said? Well, London, Kentucky. They must have gone to a prison in London, Kentucky. I don't know why they would go there. I wasn't sure about that. I was wondering why they would go there. Yeah, I don't know why they would go there because that's not where death row is, but but in any event, it was a summer class. It was a death penalty seminar, and it wasn't in the testimony, but I can certainly, defense counsel would have jumped up and down if he were the person in that class, and Mr. Larson says, well, if you were down there with Roberta Harding, you know, bashing the death penalty, why wouldn't he speak up and say, no, we weren't there with her. That wasn't who we were there with. You know, you've got it all wrong. He doesn't. No one speaks up. No one says a word, and the judge gave the same treatment to when the prosecutor raised a batting claim with regard to the striking of African-American jurors. The process went exactly the same way as far as the timing and the consideration, so I'm trying to give this judge the benefit of the doubt that he just remembered who these people are. I mean, this isn't a big town. It's just, you know, it's not a huge jury pool. So, I guess that's... Is there a gender claim as well? That took me right to another point. Thank you, Your Honor. There is a gender claim. In fact, after we've talked about all that, I probably look like a fool, but I don't think there's a race claim because it was a gender claim from the beginning. There's no doubt that that's all Mr. West is talking about when he raises his objection, and for some reason, on direct appeal, when the Department of Public Advocacy filed their brief, you know, I guess people hear Batson and they assume race, and so Batson is there, and race and gender are talked about. The Commonwealth's brief responds to it. They talk about it. The Supreme Court talks about it, Kentucky Supreme Court, and so why they felt the need to do that and not focus on the fact that it really was just a gender claim, I don't know, and that again raises the same issue with the judge as far as his statements about this, you know, if this class is protected, you know, are white males protected? We're in the same boat. J.E.B. versus Alabama for the U.S. Supreme Court, it says civil and criminal cases, gender is protected in this instance, but it was a civil case. It involved a child support issue and or a paternity issue and Why should it be any different in criminal cases than civil? Well, I personally, it shouldn't be, but the fact that the Supreme Court said that in a case that wasn't a criminal case, it's dicta, and so it's not clearly established federal law going by the AEDPA standards. I don't I don't necessarily disagree with Mr. Burke about race or gender in this instance as a policy issue, but again, and maybe as a predictor, the Supreme Court might turn around and say that both of these apply when they finally get them, but the fact of the matter is they haven't. They haven't said that gender in criminal cases is protected and they haven't said that white defendants with white jurors is protected. Well, since the Kentucky Supreme Court looked at it as gender and race, don't, are we, aren't we supposed to do that even though that seems to defy reality or? I think my opinion is it was, it was actually, it's a procedural default by virtue of the fact that it was never actually an objection at trial. They're, yeah, but I mean, they're taking it up. You can have forfeitures by the state and sounds like the state didn't raise this. In state court, they didn't raise a fuss about it, but again, it's a, you know, you're talking about the telephone size brief, telephone book size brief, that's like a four-page Batson argument and they just, they all overlooked it. I know. It's a telephone book and you can't get that right. Well, when you raise 20 some odd issues and you stick, I mean, you're throwing a lot against the wall to see if something will stick. I think again, it all started from a miss, a mistake on the part of the people that filed the case and all of a sudden everybody just went on and I think the Supreme Court, as they say, you know, their comment is something to the effect of, well, so US Supreme Court has never said that white males are a protected class, but these other courts have, so we'll go ahead and just say, we'll review it and say no. So they just sort of, it was almost a throwaway. Well, we don't, this doesn't really count because it's a, the Supreme Court hasn't said this, but you know, we'll go ahead since we think it's wrong anyway. And kind of reviewed it when they probably shouldn't have. And why it wasn't noticed until now, I don't know and not at the beginning, but but yeah, I would, I would argue it's procedurally defaulted. If you define that it's not, then certainly, I think the other problems that they have with it as far as the lack of express findings not being something that's required. And then the other two issues about whether whites or gender are protected in this instance, would take care of it. With regard to ineffective assistance of counsel, I don't want to start with prejudice because it wasn't something that was explicitly reviewed in the Kentucky Supreme Court's opinion, but nevertheless. So then we review it de novo, correct? Correct, but that being said, the prejudice here, it would take an awful lot to wash away the horrible nature of this crime. And Ms. Cottle's attorneys, seven witnesses, she had a mitigation specialist, she had an investigator, she had two attorneys, you know, she had two experts, you know, they looked into everything you could look into. They presented all of this evidence. Was it presented and perfectly packaged in a way with hindsight that they wanted it to be packaged? Probably not. But was it packaged the way someone who is in the middle of a death penalty trial and or preparing for a death penalty trial and would make reasonable judgments based on what they're doing leading up to trial? Absolutely. I mean, you look at the... There was virtually no preparation of most of the witnesses who actually testified. Well, I don't know that and they... that is based off the affidavits of people that and having done this for a while, and I'm not trying to suggest anything, you know, any malintent on my opponents, but those affidavits, you're always filed, then there's no, you know, if there's never a hearing, there's no cross-examination, there's never the opportunity to go any further, but those are always as... It's almost as important what they don't say as what they do. Several of them say, I never talked to Mr. West before I testified. Well, did you talk to the mitigation specialist? Did you talk to the other attorney? Probably, probably not. I don't know. I mean, it's possible, but my guess is that there probably were other contacts where Mr. West may not have had direct contact with every single person, but he had certainly a lot of contact, and most of the mitigation witnesses, the problem come came from the fact that apparently Ms. Cottle wasn't being cooperative with her own attorneys. So if you have questions about this that you say you couldn't explore with affidavits from the other side, should the case be remanded to the district court so that the evidentiary record could be more fully established? No, because once you look at those affidavits, they say so little or they just say what was already said in a different way by a different person, but the all of the information was already there. As was pointed out earlier by Judge Kethledge, the Dr. Allen wasn't called to testify for a reason. He did more harm than good. Because he said that she said that her father didn't abuse them. Right. But I understood that there are cases that say that this is a fairly typical statement of people who have been abused and who have who really don't want to admit that they were abused. Well, that's possible, but it still would have undercut the rest of her witnesses and no one from between Dr. Schilling or Dr. Allen said anything remotely similar to that. In fact, Dr. Schilling said that well she's got this cerebral dysfunction, but you know, Dr. Allen's important because he can say things that I can't say like whether or not it came from a head injury or all the drugs she had done. Well, then Dr. Allen comes along and says she has cerebral dysfunction. It's probably from a head injury or all the drugs she did. You know another point of Dr. Allen, isn't that beyond the COA? I thought the COA was about that was granted was about lay witnesses. Am I wrong about that? I don't specifically recall that being and I apologize. I would certainly have loved to say yes, that's absolutely right, but I don't know. For being honest. Yeah. Yeah with just complete candor. I'm not positive but to the extent that you know, they're raising this as a claim that she somehow had all this evidence that would have tipped the scales in her favor. It's just there's no way. There's literally no way all these people did what I mean her brother complains in the affidavit that he didn't get to say a lot of things. Well her brother practically I mean, he broke down on the stand and was inconsolable and was it you know, it's one of those things where you know, Mr. West the attorney that was questioning these people. He can't testify for him. He can't. I'm sorry. Why was their testimony the family's testimony so terse, do you think? You know one word answers. I don't know a lot You know, it didn't really paint a picture. Yeah, and I was odd. I mean, yeah I mean it would all be speculation, you know, these people are from Whitesburg it's all you know, they're they talk about and some of their affidavits about how everybody sticks to themselves and you know You're not aware of a reason that would matter in terms of the merits of her claim Correct. Correct. I think drawing out and more information similar to maybe what they've packed into the affidavits. I Don't know how you could have done that without just speaking for them, which is what the affidavits pretty much do Do you know I mean, can you remind me at least what the record says or doesn't have with regard to whether counsel? Investigated the testimony of the abusive boyfriend I mean they can't did the count was counsel aware of what they were going to testify to Yes, I well, I assume so in the sense that From Virginia caught of herself and dr. Schilling that information was all there Maybe I don't know if he ever talked to those people or that they gave him any sort of information but the the fact that she'd been abused by Garrett and blamed by the grandmother, which is probably the most compelling part of that which got in through, Virginia, but I Think any of that information he knew of he just it was coming in from somebody other than that particular boyfriend and again she she ran with a Crowd that I don't know that they would have gotten much out of these witnesses. Anyway, they look great on affidavits, but Don't always look great in court That you put Coddles Habeas and post-conviction lawyers in an impossible bind if you say that Having these affidavits isn't enough That it isn't enough to get further Evidentiary materials or to require that your side cross examine examine these witnesses in other words They have affidavits saying I was never contacted I wasn't contacted in time. I wasn't told how to Testify I would have said that she'd had a terrible childhood and and so forth and So why isn't that enough at least to put a burden on the state to do further? Work to present the other viewpoint Well, my intent was certainly not to put them in a bind it was more to answer your question with regard to Taking something from that affidavit and just assuming it's fact without looking at the negative inference What that's probably there as far as who was talked to or when they were talked to in that sort of thing if they'd presented affidavits that perhaps had new and compelling information that That should have been presented and wasn't then certainly that would be something that would make a lot of sense but Kind of elaborating or adding to If you haven't even caught that amending and saying in a different way stuff that was already said That's the reason you don't have to go back and do that because you know Having Thomas Garrett who well, he committed suicide, so he could that's a bad example One of the other boyfriends that Said he abused her. Well if dr. Schilling's already said that You know Did dr. Schilling get his information from Caudill herself? Was that his source of information? I don't know exactly where he got all of his information. He I know he was working. What does his report say? I don't recall specifically with regard to the boyfriends. I'm sure Well, I know he worked closely with the mitigation specialist so My assumption there would be that he talked to her as well as Miss Caudill and but he could have talked to her family. I just don't know. I'm sorry There no more questions. Thank you very much I Only have five minutes I'm gonna have to make this quick but much of what I heard from mr Kreigel over the last 30 minutes at least or the last 15 minutes regarding ineffective assistance was blatant speculation he as Judge Moore pointed out. He doesn't when he doesn't like the what the affidavits say he wants to disregard them and yet he insists there's no reason to have an evidentiary hearing to determine exactly what investigation was carried out by the trial attorneys One point before I go on to move on that he claimed just before he sat down that they he had a close working relationship with the mitigation Specialist, but we know from a from a letter which is in the record Which is court has seen that as recently as six weeks before trial keeping in mind that They were hired a year before trial six weeks before trial She hadn't compiled her mitigation report that she had she hadn't collected Medical records are actually she didn't request medical records until days before trial So she wasn't having she didn't have a close relationship with the with the investigator In fact with the trial attorney, in fact, that letter says quote, please help. So I think it's important here when we're Addressing the court that we speak with candor and what mr We need to apply otherwise Okay. Well, I would suggest that his his his statements to the court are inaccurate with the record Well, I mean, I'll tell you what I'm focused on is the issue of prejudice okay, and I and and just to tell you very briefly the concern seems to be that thematically counsel at trial did get the various themes out and it These themes would have been more vivid and concrete. Is that a fair characterization? Well, that's partially that's partly true first of all, we know that The failure to present evidence or presenting it in a flat way when it could have been better developed with more details And more effective mitigation. We do know that that is not cumulative evidence in there and in this this circuit has found that in Johnson v Bagley as matter of fact But that's only part of it the other part of it is the the the evidence of brain damage which the United States Supreme Court has said goes to the very heart of the role of the jury in deciding whether or not to sentence someone to death because it goes to moral culpability and The evidence at trial with first of all, there was no evidence from that. There was neuropsych psychological testing establishing Brain damage, dr Schilling testified that he gave a test that indicated that perhaps there was could have been one of various causes for some Deficiency, correct. And in fact, but the here's the here's the important part. Dr. Cooley the the Commonwealth's expert testified rebutted that entirely and said no that he had done a Based on a conversation a life history with Virginia had decided that her head injuries did not amount wouldn't cause Ironically wouldn't cause brain injury because he compared them to the injuries to football players but The jury didn't hear the neuros the neuropsychological Testing and the reason they didn't I'm sorry. Dr. Allen and they didn't hear. Dr. Allen Okay, so as far as the mixed bag here's In Sears v Upton the the United States Supreme Court found prejudice despite the fact that there was evidence that supposedly was double-edged sword Regarding a person at the defendant having a personality disorder and what the court was similar to what? Very very similar to what we're talking about here in Virginia Cottle Sure, and what and what the it wasn't the heart of his defense probably but anyway and what the United State well I think I think it's an important point here because what the Supreme Court said is that Just because there may be something that the makes the the defendant seem less likable to the jury What's important? Is that allow it humanized the jury? I'm sorry that the defendant allows them to understand the Defendant a little bit more so to say that that's some problem here Is that it undermines what in fact was a defense? It doesn't do that at all. Your honor a def is Isn't it true that a defense theme in fact at this trial was that the father was extremely abusive? The the theme was that he was extremely abusive to he was he was a when you got drunk He was extremely abusive to his wife. Although the the presentation of the of the testimony was poor But let me and and that not include the kids and that for the theme include the kids to a small extent Yes, but the mother did not the mother did not testify to that And the theme was that the trauma the childhood trauma of a young girl witnessing her father and by the way There was evidence that again affidavits that should have had a hearing So that they and which you request an in-district court and in in this in the in the state court Show of firing a gun near the girl where she was huddling with her girl with her grandmother You know losing control of her bladder because of her fear shaking in her bed None of which the jury none of which the jury heard But so evidence was presented it post conviction in the state court It was but of course we weren't granted an evidentiary hearing so there were only affidavits Which is why there was a request for an evidentiary hearing which was denied and the reason it was denied is because the court applied the wrong standard for the for Whether or not it was a reasonable investigation again The court decide decided it was based on what was presented rather than what could have presented been presented if it was actually investigated Which it wasn't and that goes both to to dr. Allen it goes to the to the hospital records It goes to all of the witnesses regarding abuse and it goes to the to the witnesses involving about dr I just want to make sure I understand your explanation as to why the COA covers dr. Allen so it would seem potentially to do it is on 16 a I guess your subclaim was whether Caudill's trial counsel was constitutionally ineffective For failing to call additional witnesses during the penalty phase of proceedings so you could say Dr. Allen additional witness, so I guess that's the way you could think about it But as I understand it 16 B was about ineffectively using experts Which would more specifically? Be about that topic and then in our COA order we talked about additional witnesses Identified by Caudill and as I understand it, dr. Allen was not identified at the COA stage I just want to you know, I don't know that this makes a difference, but just give me your explanation as to why Dr. Allen just hear the question sure why dr. Allen and the arguments about him are included in the COA Just okay. Well, dr Allen had been had been part of the process ever since the 1142 stage which is in state court He was consistently part of that in post-conviction in the district court in your COA application under Subclaim 16 a he referred to dr. Allen. That's the only question I'm asking I don't I can't tell you what I don't have it in front of me But I can tell you that why is he part of the COA because the the request for the COA went to the penalty phase mitigation Investigation and presentation but 16b is about ineffectively using experts. He's an expert He is an expert judge I don't have I do not have that in front of me, okay All right. Well, anyway, then but I just wasn't just wanted to make sure it was within the seal I I almost I am I am almost certain that it was within the COA. Okay My time is up, but I'd like to just take two seconds to wrap up here number one I think it's important for the court and I understand much of the much of the questioning that was going on in the With mr. Cry go and sunset with me About whether the jurors were credible or not credible was the role of the trial court first, which didn't happen This court is not in a position and under the under Supreme Court clearly established law is not that is not the the appellate Court's role to decide whether or not those jurors are credible That is the job of the trial court, which never happened because he never did the third step of the Batson validation. And secondly There is a myriad of evidence of deficient performance and prejudice towards miss miss coddle in penalty none of which was we were denied a hearing in in State court denied a hearing below and as as counsel for the for the government has asserted has acknowledged some of that is Proves that the deficient that there was deficient performance a Hearing is required here and this court should grant the writ on both claims Thank you. Thank you both for your argument. The case will be submitted with the clerk adjourned court You You You You You You You You You You